UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Novia Communications, LLC,                              Case No. 16-cv-587

       Plaintiff

   v.                                                    MEMORANDUM OPINION

Jesse Weatherby, et al.,

       Defendants


## I.    Introduction

Before me are: (1) Plaintiff Novia Communications, LLC's motion for partial summary judgment (Doc. No. 16) with opposition by Defendants (Doc. No. 19) and reply by Plaintiffs (Doc. No. 21); and (2) Defendants Community Broadcast Group, Inc. and Jesse Weatherby's motion for partial summary judgment and attorney's fees (Doc. No. 17) with response by Plaintiffs (Doc. No. 18) and reply by Defendants. (Doc. No. 22).

## II.    Background

Defendant Community Broadcast Group ("CBG") is the licensee of a television station in Toledo, Ohio. On October 1, 2014, the parties entered into an Asset Purchase Agreement ("APA"), under which Novia would purchase certain "Station Assets" from CBG. Pursuant to the APA, the Closing of the purchase was contingent upon Final FCC Consent to the transfer of the FCC license from CBG to Novia. At the time the APA was executed, neither party foresaw any issue in acquiring FCC Consent.

On October 9, 2014, CBG submitted the application for transfer to the FCC. One month later two minority shareholders of CBG filed a Petition to Deny the CBG's application with the

FCC. The minority shareholders also filed suit against Novia, CBG, and CBG majority shareholder, Jesse Weatherby in this court, contesting the APA. ("Prior Litigation"). *See A Renewed Mind v. Weatherby*, Case No. 3:15-cv-00165 (N.D. Ohio). After nearly a year, on or around December 23, 2015, Novia settled Prior Litigation with minority shareholders on behalf of all three, dismissing the case with prejudice.

Because of the unexpected delay in obtaining FCC Consent and Closing on the APA, Novia and CBG entered into another contract, the Local Marketing Agreement ("LMA"), on March 16, 2015, while the litigation was pending. (Doc. No. 16-2 at 50). Pursuant to the LMA, Novia agreed to make monthly payments to CBG to ensure the Station remained operational while FCC Consent was pending. While the LMA was to be in effect for five years, it could be terminated by either party under certain circumstances. *Id.* at 55.

Novia made payments pursuant to the LMA throughout the time it was settling Prior Litigation. But immediately after the settlement was complete and Prior Litigation dismissed, CBG terminated the APA and rescinded the request for FCC Consent. Although CBG asserts that it properly terminated the APA pursuant to Section 12.1(b), Novia filed suit in this court asserting, among other things, a claim of breach of contract. At the time of briefing, Novia had continued to make monthly payments under the LMA.

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its

resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

IV. DISCUSSION

Novia and CBG each move for summary judgment on Novia's Count I breach of contract claim. Each also move for summary judgment on Counts II and III, specific performance and declaratory judgment of the APA. Finally, CBG and Weatherby move for summary judgment on Novia's Count IV constructive trust claim. Counts II, III, and IV are dependent upon the outcome of Count I. The parties agree that this contract dispute is governed by New York substantive law, pursuant to the forum selection clause of Section 13.5 of the APA. (Doc. No. 1-4 at 17).

A. Breach of Contract

Generally, summary judgment "may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see also Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). Contract language is ambiguous if a reasonably intelligent person, looking at the document as a *whole*, could interpret it to have more than one meaning. *See Sayers v. Rochesterter Telephone Corp. Supp. Management Pension Plan*, 7 F. 3d 1091, 1094-95 (2d Cir. 1993); *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987). To give effect to the purpose of the contract and render no section superfluous, all sections of a contract must be "read in the context of the entire agreement." *Sayers*, 7 F.3d at 1095 (citing *W.W.W. Associate, Inc.*, 77 N.Y.2d at 163); *see also Williams Press, Inc. v. State*, 37 N.Y.2d 434, 440 (1975) ("A written contract will be read as a whole,

3

and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.") (citations omitted).

The breach of contract claim turns on whether or not CBG properly terminated the APA pursuant to Section 12.1(b). The Section provides that the APA may be terminated, in writing:

> by [CBG] or [Novia] if the Closing shall not have occurred on or before 270 days following the date of this Agreement; provided, however, that the right to terminate this Agreement under this Section 12.1(b) shall not apply to any party whose failure to fulfill any material obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date.

(Doc. No. 1-4 at 14). In other words, to breach the APA, CBG must have, first, failed to fulfill a material obligation of the contract. And, second, that failure must have caused the Closing Date not to occur by June 28, 2015—270 days after the APA was executed on October 1, 2014.

Novia alleges that CBG failed to fulfill at least four material obligations of the APA, specifically Sections 4.6, 4.11, 9.1, and 9.5. To determine whether CBG failed to fulfill these contractual obligations, two questions must be answered. First, on what date or dates was CBG required to comply with the obligation? Second, did CBG comply with the obligation on that date or those dates?

1.  Compliance Obligation Dates

Novia alleges that CBG had a continuing obligation, from execution to Closing, to fulfill the obligations of the Sections cited. Meanwhile, CBG argues that a piecewise approach should be used to determine the compliance obligation dates of the Sections. Neither the law nor the plain language of the APA support either parties' arguments, in full. As noted above, New York law requires the APA to be read as a whole, considering the different Articles and Sections in relation to one another to determine the meaning of the contract and intention of the parties.

a.  Sections 4.6, 4.11, and 9.1

Articles IV consists of the representations and warranties of conditions existing *at the time* the APA was executed, as reflected by the use of present-tense language. (Doc. No. 1-4 at 4).

4

Meanwhile, Article VI contains covenants that CBG agreed to perform "from the date hereof until the completion of the Closing." *Id.* at 9-10. The two Articles work in conjunction with one another. Section 6.1(b) states, "[CBG] shall not, by any act or omission, knowingly cause any of the representations and warranties set forth in Article IV to *become* untrue or incorrect in any material respect." *Id.* at 9 (emphasis added). Section 6.2 states, "[CBG] shall give written notice in reasonable detail to [Novia] promptly upon learning of the occurrence of any event…that would have caused a material breach had such event occurred or been known to [CBG] prior to the date hereof, of any of [CBG]'s representations or warranties contained in this Agreement." *Id.*

In short, at the time the APA was executed, CBG warranted that the contents of Article IV were true. While those warranties and representations *may* become untrue during the time Closing is pending, CBG covenanted not to cause them to do so. And, if an outside force caused those warranties and representations to become untrue, CBG covenanted to notify Novia of that event, in writing.

To close on the APA, all conditions of Article IX must have been met "prior to or on the Closing Date" *unless* waived by Novia. *Id.* at 11-12. While the conditions in *whole* must be completed prior to or on the Closing Date, some of the *individual* conditions have more specific compliance dates. With respect to Sections 4.6 and 4.11, currently at issue, Section 9.1 states:

> (a) Each of the representations and warranties of [CBG] contained in this Agreement shall have been true and correct in all material respects *as of the date when made* and shall be deemed to be made *again* on and as of the Closing Date and shall then be true and correct in all material respects.
> (b) [CBG] shall have performed, and complied with, in all material respects, each and every covenant and agreement required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

*Id.* at 11 (emphasis added). Not only does Article IV lack the "from the date hereof *until* the completion of Closing" of Article VI, but also, under Section 9.1, the representations and warranties are distinguished from covenants and designated a separate time frame of compliance.

5

Under the plain language of the APA, Article IV obligations must be complied with on two distinct dates: (1) when the APA was executed on October 1, 2014; and (2) the Closing Date that never occurred. The only "continuing obligation" CBG had with respect to Article IV were: (1) not to *cause* one of the representations or warranties to become untrue; and (2) to *notify* Novia, in writing, of any event that did. Novia does not allege CBG failed to fulfill either of these obligations. Of the Sections cited, there was no "continuing obligation." Since there was no Closing Date, the compliance obligation date of Sections 4.6 and 4.11, and in turn Section 9.1, is the date of execution, October 1, 2014.

b.      Section 9.5

The compliance obligation date of Section 9.5 falls sometime within the introductory clause of Article IX and must be completed "prior to or on Closing Date." In other words, while the condition must be completed *by* the day of Closing, the question is whether compliance was required *before* the Closing Date. Section 9.5 states, "There shall not be any Liens on the Station Assets (other than Permitted Liens) or any financing statement of record with respect to the Station Assets except those to be released at the Closing." *Id.* at 12.

As discussed previously, other Sections of the APA may aid in the interpretation of this Section. Section 1.3, first defines "Liens," providing,

> The Station Assets shall be sold and conveyed to [Novia] free and clear of all liabilities, debts, mortgages, liens, deeds of trust, security interests, pledges, restrictions, prior assignments, charges, claims, defects in title and encumbrances of any kind or type whatsoever (collectively, "<u>Liens</u>"), except for liens in favor of [Novia] and liens disclosed in *Schedule 1.3* attached hereto (collectively, "<u>Permitted Liens</u>").

*Id.* at 4. Section 1.4 defines the Closing Date as the date of the "consummation of the sale and purchase of the Station Assets." *Id.* Reading Sections 1.3 and 1.4 together, the Station Assets must be "free and clear" of Liens by the Closing Date. Section 4.6 also supports this conclusion, requiring "[CBG] has good, valid and marketable title to all of the Station Assets, and such title will be delivered free and clear of all *Liens* at the *Closing*." *Id.* at 6 (emphasis added). Though this

6

condition *could* be completed "prior to" the Closing Date, Section 9.5 *must* be complied with on the Closing Date. Since the Closing Date never happened, CBG did not fail to fulfill this material obligation.

2. Substantive Compliance

To satisfy the "failure to fulfill any material obligation" requirement of Section 12.1(b), the warranty and representation made by CBG in Section 4.6 *or* Section 4.11 must have been false at the time the APA was executed.

a. Section 4.11

Section 4.11 states,

> [CBG] is not subject to any order, writ, injunction, judgment, arbitration decision or decree having binding effect and affecting the Station or the Station Assets or which restrains or enjoins the transactions contemplated hereby, and no such proceeding is pending. There is no material litigation pending by or against, or to the best of [CBG]'s knowledge, threatened against [CBG] which relates to the Station or could affect any of the Station Assets.

*Id.* at 7. Novia states that Prior Litigation was a breach of this obligation. But, it was not filed until January 27, 2015. Since this was nearly three months after the compliance obligation date of October 1, 2014, this obligation will be fulfilled *unless* CBG had knowledge of the threat of Prior Litigation at that time. Novia makes no such assertion so I find CBG fulfilled the contractual obligation of Section 4.11.

b. Section 4.6

Section 4.6 states, in part, "[CBG] has good, valid and marketable title to all of the Station Assets, and such title will be delivered free and clear of all Liens at the Closing." *Id.* at 6. Novia asserts that since the title was never delivered "free and clear of all Liens at the Closing," CBG breached the APA. But this conclusion would require the Section to be interpreted to mean that if Closing did not occur, CBG breached the APA. If that was the case, multiple sections of the APA would become superfluous, in violation of New York contract law. *See Sayers*, 7 F.3d at 1095. For example, the termination clause of Section 12.1 would be unnecessary since terminating the APA

7

before Closing would, in itself, be a breach of Section 4.6. Section 4.6 does not require Closing itself, but only delivery of title "free and clear of all Liens" in the event of Closing.

Pursuant to the compliance obligation date discussed above, I find that if CBG had marketable title at the time the APA was executed and the good faith intent to deliver the title "free and clear of all Liens at the Closing," the obligation of Section 4.6 will be fulfilled. The parties do not dispute whether CBG had marketable title at the time the APA was executed. (Doc. No. 22 at 8). The remaining question is whether CBG, in good faith, had the intent to close and deliver the title at the time the APA was executed. There is no evidence that CBG entered into the contract against its will, without the intent to fulfill its obligations and close. In fact, the evidence supports CBG's diligence in defending Prior Litigation and pursuing FCC Consent. Therefore, I find that CBG fulfilled Section 4.6 on the compliance obligation date.

c. Section 9.1

To find CBG failed to fulfill Section 9.1, CBG must have also failed to fulfill either Sections 4.6 or 4.11. As noted above, this is not the case. CBG fulfilled all material obligations and had the right to terminate the APA pursuant to Section 12.1(b). Under the plain language, CBG did not breach the APA.

B. Equitable Estoppel

Novia argues that even if CBG had the right to terminate the APA under Section 12.1(b), CBG should be estopped from doing so. The doctrine of equitable estoppel is

> imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.

*Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y. 2d 175, 184 (1982); *see also Metropolitan Life Insurance Co. v. Childs Co.*, 230 N.Y. 285, 292 (1921) ("An estoppel rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury.").

Estoppel requires conduct by both the party seeking estoppel and the party to be estopped. *See BWA Corp. v. Alltrans Express U.S.A.*, 112 A.D.2d 850, 853, 493 N.Y.S.2d 1 (1st Dep't 1985); *In re DiLasco v. Tilden Glen Head, Inc.*, 69 A.D. 3d 1171, 1172, 894 N.Y.S.2d 203 (3d Dep't 2010). The party to be estopped must have: (1) made a false representation or concealed material facts; (2) had actual or constructive knowledge of the real facts; and (3) had the intention or expectation that the other party would rely and act on the false or concealed facts. *See BWA Corp.*, 112 A.D.2d at 853; *DiLasco*, 69 A.D. at 1172. The party seeking estoppel must have: (1) been unaware of the real facts; and (2) materially changed its position to its substantial detriment, in reliance on the other party's conduct. *See BWA Corp.*, 112 A.D.2d at 853; *DiLasco*, 69 A.D. at 1172.

As noted above, CBG had the contractual right to terminate. It is true that Novia had knowledge of the contents of the APA, including the termination clause. But "where an option is to be exercised and there is no time limit set forth in the agreement, such an option must be exercised within a reasonable time." *Savasta v. 470 Newport Association*, 180 A.D.2d 624, 626, 579 N.Y.S.2d 167 (2d Dep't 1992), *aff'd* 82 N.Y.763, 765 (1993) ("What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case."); *cf. Flushing Unique Homes, LLC v. Brooklyn Federal Savings Bank*, 100 A.D.3d 956, 958, 954 N.Y.S.2d 606 (2d Dep't 2012) (denying estoppel because the contract contained a "no waiver" clause that explicitly allowed for delay in the enforcement of rights). In *Savasta*, the party to be estopped exercised the contractual right to terminate the contract 22 months after the option became available. *Savasta*, 180 A.D.2d at 626. Because the terminating party had "accepted the benefits of [the] agreement" for 22 months, the court held that they had "waived their right to terminate [ ] and [were] estopped from" doing so. *Id.*

Here, CBG waited six months after the 270 had elapsed before exercising the option to terminate. During this time, Novia was making monthly payments to CBG under the LMA to ensure the Station remained operational. CBG asserts that since the payments were made pursuant to the LMA, Novia was simply fulfilling its contractual obligations, rather than acting in reliance.

9

But CBG acknowledges that Novia only entered the LMA and made the payments to ensure the Station was operational when FCC Consent was finally received. Novia not only made monthly payments during this time, but was also pursuing settlement on Prior Litigation on behalf of itself as well as that of CBG and Weatherby. CBG asserts that it never asked Novia to pursue settlement on its behalf. But, as with the issue of payments, CBG acknowledges that it knew Novia's intent in seeking settlement quickly was "Novia's expectation that the FCC would more readily approve the Application." (Doc. No. 19 at 23). During this time, there is no evidence that CBG gave any indication that it intended to terminate the APA.

Immediately after Novia settled Prior Litigation, dismissing the case with prejudice against all three parties, CBG terminated the APA. At the time of termination, CBG was not only free of any claims by the minority shareholders, but also in possession of the Station, operational only by the payments made by Novia. Novia was left with nothing to show for its diligent efforts. This is exactly the sort of injustice that equitable estoppel seeks to prevent. Novia relied on the understanding that CBG intended to Close on the APA to its detriment. CBG knew that Novia was acting for the purpose of Closing on the APA and CBG's own option to terminate for six months, but chose to silently accept the benefits. There is no evidence that the timing was merely coincidence or that Novia knew or should have known of CBG's intent to terminate when expending time and resources to ensure Closing.

Though termination was not a breach of the APA, CBG is equitably estopped from doing so. Summary judgment is granted to Novia on Counts I, II, and III. So long as the remaining conditions of the APA have been met, specific performance is granted to Novia pursuant to Section 12.3. (Doc. No. 1-4 at 15). Since CBG did not prevail, its motion for attorney's fees is denied.

V. CONCLUSION

The doctrine of equitable estoppel bars CBG from exercising the right to terminate. Novia's motion for partial summary judgment is granted. (Doc. No. 16). CBG and Weatherby's motion for partial summary judgment and attorney's fees is denied. (Doc. No. 17).

So Ordered.

s/ Jeffrey J. Helmick<br>United States District Judge